STATE, Respondent, v. COMES, et al, Appellants.

(268 N. W. 724.)

(File No. 7886.   Opinion filed September 1, 1936.)

F. J. Parker, of Deadwood, and Dan McCutchen, of Belle Fourche, for Appellants.

Walter Conway, Attorney General, and R. F. Drewry, Assistant Attorney General, for the State.

538

ROBERTS, J. An information in two counts was filed against the six defendants by the state's attorney in the circuit court of Butte county. The first count charges that on the 29th day of May, 1934, within the county of Butte the defendants "did wilfully, unlawfully and feloniously, commit the crime of participation in a riot, as follows: That at said time and place said six persons, acting together and without authority of law, wilfully, unlawfully and feloniously and by the use of force and violence and while advising, encouraging and assisting each other thereto, did seize one Paul Longpre and against his will, cause to be tied and did tie the feet of said Paul Longpre to the tail of a horse by means of a rope and did cause to be released and struck and did strike and release said horse so that said Paul Longpre was then and there dragged along and upon the ground by said running horse." The second count charges the defendants with the offense of an assault with intent to kill. The trial resulted in the acquittal of defendant Harris Clark. The other defendants were convicted under each count of the information and appeal to this court from the judgment and order overruling motion for new trial.

It appears from the evidence introduced that appellants were extensively engaged in raising sheep. The spring of 1934 was one of extreme drouth, and water for livestock in the range country was scarce. Defendant Howard Schmele on May 7, 1934, bought a tract of land in Butte county known as the "Byers place," on which there was a water reservoir created by a dam constructed across a shallow ravine. David Kinghorn claiming right of possession to the Byers place under a lease watered his cattle at this reservoir. Howard Schmele exhibited to Russell Kinghorn a writing signed by the former owner stating that he had sold the land to Schmele with the right of immediate possession. David Kinghorn still asserted his claim of right to possession of the premises. A proceeding was commenced to place David Kinghorn and his son Russell under bond to keep the peace, but was dismissed upon agreement of parties to furnish bonds.

On Tuesday morning, May 29, 1934, appellants and their sheep herders, Harris Clark and Vernon Shannon, were at the dam through which a trench had been cut permitting the greater part of the water to escape. The Kinghorns had constructed a dam

below the Byers reservoir, and appellants suspected that the King-
horns had cut the dam to release the water into their newly con-
structed reservoir. Paul Longpre, an employee of Kinghorn,
came near the reservoir driving cattle, and defendants gathered
about him inquiring if he knew who cut the dam. Longpre testi-
fied: "They drove up to me when I was herding my cattle and
asked if I knew anything about the dam being cut and I told them,
No, and they kept asking questions and I told them I did not know.
Finally the two of them rode up to me and got hold of my horse
and Mr. Schmele he walked up there. It was Henry Comes and
Howard Schmele. They walked up and grabbed my horse. Then
Mr. Schmele took me off my horse and Howard Schmele and
Henry Comes assisted him from the other side. Mr. William
Schmele then threw me down and sat on me. They asked me more
questions, if I knew anything about that dam and I told them,
No. Marcus came up and threw dirt in my mouth and eyes and
showed me his heel saying 'I have a notion to kick you in the ribs.'
He then kicked me in both ribs with his foot. They asked if I
knew who broke the dam and I told them, No. They asked if
breaking the dam had been discussed and I said, No, and they
slapped me some more. Then Howard Schmele threatened to get
a gun and kill but they paid no attention. They told me to tell
what I knew and I told them I did not know nothing. Finally they
said they was going to give me a ride. So Henry Comes got hold
of my legs and they got a rope out of the car, I think the defend-
ant's car. Then Harris Clark got hold of the horse and held him
while Howard Schmele tied the rope to the horse's tail and they led
it a little way. They said if I knew anything to tell because they
were going to turn him loose. When the horse was kicked he
gave a jump and started running. I think southeast, running fast.
Part of the time I was sitting up and some of the time on either
side. The ground was sage brush, some cactus and rocks. I had
no protection just holding my hands on my legs. Had hold of my
overalls to keep my head from hitting the ground. I was in a
sitting position most of the time and on either side. I was just
dragged along on rock and sagebrush and cactus. I rode so fast I
couldn't tell nothing else. The ride stopped when Howard Schmele
got a hold of my horse. He was on horseback. He rode up on
the sheep herder's horse. He came up on the left side and when

the horse stopped I untied my legs, one leg had the loop and the other half hitch, the right leg had the loop and the left leg the half hitch. I was in an awful condition. The skin was gone from my seat and the left leg was numb. Both arms were aching. This occurred between 9:30 and 10 o'clock. After I untied myself they still asked me if I knew anything about the dam. All of the defendants asked different questions. I told them I did not know anything about it. I wanted my horse. I was feeling faint. I wanted to go home. I walked up to my horse but Mr. Comes and Mr. Henry Comes—and Henry Comes got hold of me and pushed me up against the car and told me to stay there and tell what I knew and I said I did not know nothing. Howard Schmele took my horse and drove the cattle away from the dam. The defendants wanted me to go and I told them I could not do it. I had to go home. I got my horse about half an hour after I got untied and during this half hour I was getting up, walked around a little and laying down. After I got my horse I rode toward Kinghorn's about two miles and a quarter. I met Mr. Kinghorn about a quarter of a mile west of his house and got in the car and came to Belle Fourche. We went to the court house and from there to the jail and Mr. Craven called Dr. Davis and they took me to the hospital where I stayed ten days. I have some scars on my seat and back and one on my leg where the half hitch was." In his testimony as to his injuries the complaining witness was corroborated by the physician who examined him.

The defendant testified that Longpre became entangled in his own lariat rope when Howard Schmele and Henry Comes were trying to grab hold of him; that when his horse dragged him they did everything they could to catch the horse; that Longpre disentangled himself and walked around picking up ammunition which he had lost from his pockets; that others assembled at this place; that there was further argument concerning the cutting of the dam; and that the complaining witness then mounted his horse and rode away.

The first contention made by the appellants for reversal of the judgment and order overruling motion for new trial is that count 1 of the information does not state facts sufficient to constitute a public offense.

"Riot" is defined by section 3934, Rev. Code 1919, as follows: "Any use of force or violence, or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law, is riot."

■ It is insisted by appellants that an information, to charge the crime of riot, must allege that defenedants unlawfully assembled, and must set forth the unlawful act done or attempted by the parties after the unlawful assembly. The rule is that an information is sufficient if it follows the language of the statute defining the offense. State v. Paul, 41 S. D. 40, 168 N. W. 739; State v. Bayliss, 59 S. D. 585, 241 N. W. 608. In the instant case count 1 of the information follows the language of section 3934 and was sufficient to apprise the accused of the nature of the crime charged.

■ The next contention is that the trial court erred in overruling motion in arrest of judgment and in overruling the motion for new trial for the reason that one of the jurors was a nonresident of Butte county. An objection that the juror was a nonresident should have been taken by challenging his competency. Section 4855, Rev. Code 1919. The record fails to show that any inquiry was made of the juror on his voir dire examination as to his qualifications, and the objection after verdict is not ground in arrest of judgment or for new trial. State v. Coleman, 17 S. D. 594, 98 N. W. 175; State v. Runyan, 49 S. D. 406, 207 N. W. 482.

Error is assigned in the giving of instructions. The court at the request of the defendants gave instruction 16, which reads as follows:

"I further charge you, Gentlemen of the Jury, that there is included by the law in the said charge of Assault with intent to kill, a lesser degree of assault known as assault with a dangerous weapon, which crime is thus defined by our law: 'Every person who, with intent to do bodily harm and without justifiable or excusable cause, commits any assault or any assault and battery upon the person of another with any sharp or dangerous weapon, or, who, without such cause, shoots or attempts to shoot at another, with any kind of firearm, air gun or other means with intent to injure any person, although without intent to kill such person or to commit any felony,' is guilty of Assault with a dangerous weapon.

"The distinction between Assault with intent to kill and Assault with a dangerous weapon is that an intent to kill must exist in Assault with Intent to Kill, and the only intent necessary under Assault with a dangerous weapon is an intent to injure."

The court further charged the jury that an instrument is a dangerous weapon when in the manner in which it was used it would be likely to produce death or cause great bodily injury; that a rope not in itself a dangerous or deadly weapon might become one if the feet of a person were bound with a rope tied to a horse and the horse urged to run so as to drag the person tied to the rope; and that it was for the jury, after considering the evidence as to the manner of its use, to determine whether it was a dangerous weapon. It is the contention of the appellants "that the manner in which the rope in question was used could not change its character from an ordinary article of use to one amounting to a dangerous or deadly weapon."

In the case of State v. Page, 15 S. D. 613, 91 N. W. 313, 314, this court construed the provisions of subdivision 3 of section 6678, Compiled Laws 1887 (section 3935, subd. 3, Rev. Code 1919) which declared guilty of felony a person participating in a riot who carried at the time any species of firearms or other deadly weapon. After referring to the language of the statute it is said: "It is contended on the part of the plaintiff in error that, in order to bring the case within the provisions of this subdivision, the instrument carried must be what is known as either a deadly or dangerous weapon per se, for offense or defense of the person, and that a strong and heavy whip, six feet or more in length, is neither a deadly nor dangerous weapon per se, within the meaning of the statute. We are inclined to agree with the plaintiff in error in his contention. As will be noticed, the statute is a highly penal one. When the party is found guilty of carrying a deadly or dangerous weapon, or is disguised, at the time of the commission of the offense, he is punishable for a felony. One convicted of an ordinary riot, in which no other crime was committed, and in which the party engaged carried no deadly or dangerous weapon, and was not disguised, is declared to be guilty of a misdemeanor. When, therefore, the legislature provided that a person might be found guilty of carrying any species of firearms or other deadly or dangerous

weapon, it intended that the weapon so designated as 'firearms or other deadly or dangerous weapon' should be such a weapon as the court could say, as a matter of law, was a deadly or dan-. gerous weapon. In the ordinary use of language, no person could speak of a driving whip as a deadly or dangerous weapon. It is true, it may be used in such a manner as possibly to produce death or very serious bodily injury. * * * It will be noticed by the terms of the section of the statute quoted that it is not necessary that the weapon should have been used in the riot in any manner. It is sufficient that the weapon is carried by the party. Hence it is for the court to determine in such a case whether the instrument carried is or is not a deadly or dangerous weapon, within the meaning of the statute. Where an instrument has been used in causing the death or serious bodily injury of a party, the question of whether or not it was a dangerous or deadly weapon by reason of the manner in which it was used may be a question for the jury to determine."

The instruction as to a dangerous weapon, we think, is correct. To constitute the crime of assault with a dangerous weapon under the provisions of section 4081, Rev. Code 1919, there must be an assault or an assault and battery upon the person of another with a weapon dangerous as a matter of law or capable of being used in a dangerous manner. The offense under the statute does not arise from the carrying of the weapon. The trial court in his instruction correctly stated that a rope is not per se a dangerous weapon. It may, however, be used in such a manner as to be considered a dangerous weapon, and whether it is to be so regarded is a question for the jury, taking into consideration the manner in which the rope was used.

The contention that the verdict of the jury is not supported by the evidence cannot be sustained. It was the province of the jury to determine the credibility of the witnesses and the weight to be given to their testimony. The facts and circumstances in evidence amply justify the verdict.

We find no merit in the contention that it was reversible error for the court to refuse to grant a new trial on the ground of newly discovered evidence. Alfonso Debusscher, a witness for the state, testified that he was employed by defendant Marcus

Comes; that he overheard defendant J. A. Comes say in the presence of other defendants, "If I ever catch one of them guys out in the pasture we will make them squeal if we have to kill them to do it." In support of their motion appellants produced affidavits setting forth that Debusscher had previously stated that he knew nothing about the facts in the case and that he had also made the remark that, "There is a good chance for somebody to make some money out of the deal." The only tendency of the newly discovered evidence was to contradict and impeach the testimony of the witness Debusscher. It is the well-settled rule that a new trial will not be granted for newly discovered evidence which when produced will merely impeach or discredit a witness who testified at the trial. State v. Compton, 48 S. D. 430, 205 N. W. 31; State v. Wolfe, 64 S. D. 178, 266 N. W. 116.

The judgment and order appealed from are affirmed.

CAMPBELL, WARREN, and RUDOLPH, JJ., concur.

POLLEY, P. J., not sitting.