**STATE of South Dakota, Plaintiff and Respondent,**

v.

**James ROBIDEAU, Defendant and Appellant.**

**No. 11886.**

Supreme Court of South Dakota.

Jan. 25, 1978.

John P. Guhin, Asst. Atty. Gen., Pierre, for plaintiff and respondent; William J. Janklow, Atty. Gen., Pierre, on the brief.

Robert F. Lafleur, Rapid City, for defendant and appellant.

MILLER, Circuit Judge.

Defendant appeals the judgment of conviction of riot while armed. SDCL 22–10–5. We affirm.

This is another chapter of the Custer riot incident which occurred in the City of Custer in February 1973. See *State v. Bad Heart Bull (and High Eagle)*, 1977, 257 N.W.2d 715.

The salient facts, gleaned from some 2,750 pages of pretrial and trial transcripts and volumes of record, reveal that there was a riot in Custer which resulted in extensive property damage and personal injury. The record is equally clear that the defendant participated in a melee when various Indian persons forced their way into the Custer County Courthouse; that he came into possession of a forty-inch riot baton; and that, while using this riot baton, he engaged in combat with various law enforcement officers.

During grand jury deliberations investigating the incident, no one was able to identify the defendant by name. Since photographs, television film and video tape revealed that he was wearing a red bandana around his head, he was indicted under the name of "Red Bandana Doe." A slide picture of him was attached to the indictment. Defendant was arrested on April 1, 1975. At his initial arraignment, the circuit judge amended the indictment by striking all references to "Red Bandana Doe" and inserting the defendant's true name of James Robideau.

## PRE–ARREST DELAY

Defendant urges that the pre-arrest delay deprived him of his constitutional right to a speedy trial. South Dakota Constitution, Art. VI, § 7; SDCL 23–2–11. He was indicted on August 30, 1973, and arrested on April 1, 1975. The record is not clear as to the exact time that Red Bandana Doe was identified as the defendant. It is clear, however, that he was identified by June 1974, during the time of an American Indian Movement (AIM) conference on the Fort Yates Indian Reservation near Mobridge, South Dakota.

The Mobridge conference was attended by over 2,000 AIM members and sympathizers. The defendant had identified himself to the state law enforcement authorities as

the "Chief Security Officer" for the conference.

Early in the conference, the law enforcement officers determined that the arrest of the defendant at that time, considering the atmosphere (post-Wounded Knee and Custer incidents) and the large number of persons in attendance, would be impractical and would have detrimental effects.

Later in the conference, a decision was made to arrest the defendant at a time he was seen entering a laundromat. However, before the officers were able to effect the arrest, defendant was able to evade them.

By the defendant's own testimony, he was beyond the jurisdictional limits of the State of South Dakota for sixteen of the twenty months he was at large. For at least eight months he was in other states, and for an additional eight months he was on the Rosebud Indian Reservation. By his own admission he has for the past many years used several aliases. Further, a reasonable interpretation of his testimony would lead us to believe that for several months prior to his arrest he knew that he was being sought for his participation in the Custer incident.

It is this court's holding that the law enforcement authorities exercised due diligence in attempting to take defendant into custody. Any pre-arrest delay was caused, at least in part, by the conduct of the defendant. He was not prejudiced by any conduct on the part of the state in that regard.

### POST ARREST DELAY

■ As stated before, the defendant was arrested on April 1, 1975. Following a long series of motions and suppression hearings and the like, the trial was commenced on November 3, 1975. The record seems clear that any delays were occasioned by the defendant or his counsel.

Interestingly, defendant has assigned as error Assignment VI, and we believe without merit, that he was given an insufficient time to prepare for trial. Immediately before the trial he requested a postponement.

We find that no prejudice resulted to the defendant in the delay from arrest to trial. See *State v. Starnes*, 1972, 86 S.D. 636, 200 N.W.2d 244, citing *Barker v. Wingo*, 1972, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101.

### FAMILY RELATIONSHIP BETWEEN PROSECUTOR AND JUDGE'S WIFE

■ Defendant, who had disqualified a different circuit judge, asked the trial judge to recuse himself because of the fact that the judge's wife is a first cousin of one of the prosecutors.

Canon 3(C)(1)(d) of the Code of Judicial Conduct which was adopted by this court on November 26, 1974 (see SDCL 16–2, Appx.) states:

"(1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

\* \* \* \* \* \*

"(d) he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

\* \* \* \* \* \*

"(ii) is acting as a lawyer in the proceeding \* \* \* ."

The judge's wife and the prosecutor having a family relationship in the *fourth* degree, and the evidence being clear that there were no significant social relations between them, the trial judge properly refused to recuse himself. See *State v. Erickson*, 1964, 80 S.D. 639, 129 N.W.2d 712; *Boyer v. Backus*, 1938, 282 Mich. 701, 280 N.W. 756, cert. den., 305 U.S. 644, 59 S.Ct. 147, 83 L.Ed. 416; rehearing denied 305 U.S. 674, 59 S.Ct. 248, 83 L.Ed. 437; Annot., 50 A.L.R.2d 143, and 46 Am.Jur.2d, Judges, §§ 95, 155.

### DANGEROUS WEAPON DETERMINATION

■ During the course of the trial, the judge, in reliance on our ruling in *State v. Page*, 1902, 15 S.D. 613, 91 N.W. 313, made

the determination that the forty-inch riot baton used by the defendant was a "dangerous weapon" and instructed the jury accordingly.

Defendant claims that the court should have determined that the riot baton was not a dangerous weapon and accordingly should have granted his motion to dismiss.

In support of his position and as an offer of proof, the defendant called a Mr. Kevin Parsons, who he attempted to qualify as an expert witness on riot batons. Parsons testified extensively as to the design, purpose and use of such instruments. The principal thrust of his testimony was that it is a defensive instrument not designed to be a lethal weapon. He admitted, however, that it is a weapon which can be an offensive weapon capable of breaking bones and inflicting great bodily injury.

Defendant was convicted of a violation of SDCL 22–10–5 which makes it a felony for a person " * * * participating in any riot," to carry "at the time of such riot, any species of firearms *or other deadly or dangerous weapon* * * *." (emphasis supplied)

Webster defines "dangerous" as " * * * 2: able or likely to inflict injury."

Webster defines "weapon" as "1: an instrument of offensive or defensive combat: something to fight with 2: a means of contending against another." Webster New Collegiate Dictionary (8th ed. 1974, © G. & C. Merriam Co.)

In *Page* we held, and we now reaffirm, that it is for the court to determine whether the instrument carried is or is not a deadly or dangerous weapon contemplated by the statute. See also *State v. Comes*, 1936, 64 S.D. 537, 268 N.W. 724.

## CONSTITUTIONALITY OF RIOT STATUTES

The material arguments in the assignments in this area were considered and ruled upon in *State v. Bad Heart Bull (and High Eagle), supra.* We adhere to that ruling.

We have thoroughly considered all of the other assignments of error and find them to be without merit.

Judgment affirmed.

DUNN, C. J., and WOLLMAN and MORGAN, JJ., concur.

PORTER, J., concurs specially.

MILLER, Circuit Judge, sitting for ZASTROW, J., disqualified.

PORTER, Justice (concurring specially).

The most difficult question for me was whether the baton was a dangerous weapon under the strict requirements of *State v. Page*, 15 S.D. 613, 91 N.W. 313 (1902). *Page* is directly in point and binds us unless we expressly overrule it. Defendant would at most be guilty of misdemeanor riot unless the baton came within the felony riot terms of SDCL 22–10–5.

*Page* makes clear that we may not consider the method in which the alleged weapon is used in the incident involved. Instead the trial court must be able to say as a matter of law that the alleged weapon is a dangerous weapon, *per se.* As this court noted in *Page*, the felony offense of riot, now SDCL 22–10–5, does not involve the *use* which is made of the alleged weapon during the riot, but instead is complete in any case where the dangerous weapon is simply *carried* by a riot participant, and thus the question of whether it is or is not actually used is, as I understand *Page*, immaterial and not an element. The reasoning by this court in *Page*, and the wording of our statute condemning the carrying rather than the use of the weapon, seems to require that the alleged dangerous weapon be something *designed* as a *weapon*, rather than something designed for some other use but capable of being used as a dangerous weapon. (*Page* involved a heavy driving whip, six feet long. The court there held as a matter of law that it was not a dangerous weapon within the felony riot statute, now SDCL 22–10–5.) Under *Page* a trial court may not consider the *use* made of the alleged weapon in determining whether it

was a dangerous weapon under SDCL 22–10–5, but rather must be able to find from the evidence that the instrument was *primarily designed* as a *weapon*. As *Page* notes, one engaged in a riot using any kind of instrument may be prosecuted for some other offense, e. g., assault with a dangerous weapon, or assault with intent to kill, etc. As to such other offense, it is for the jury to decide whether the manner in which the instrument was actually used during the incident in question made the instrument a dangerous weapon.

In *Page, supra*, at 616, 91 N.W. at 314, the court quotes Webster's definition of "weapon" as an "instrument of offensive or defensive combat; . . ." The court also quotes Bouvier defining "weapon" as an "instrument of offensive or defensive combat." At trial, defendant's expert witness Kevin Parsons testified on cross-examination:

Q Well, it is designed—you said basically as a weapon, correct?

A Yes

. . . . .

Q Is there any other use for this other than a weapon?

A Any other use for the baton?

Q For the baton.

A No.

It is true that Parsons' testimony strongly indicates that the instrument is designed as a *defensive* weapon, but accepting that, the weapon nevertheless comes within the definition approved in *Page* since the quotations from Webster and Bouvier in *Page* indicate *both* offensive and defensive weapons are covered by the statute.

It was also proper to consider that the baton was initially carried by a law enforcement officer as an important part of his equipment at a time when he was going on potentially hazardous duty. This is strong evidence that it was designed as a *weapon*, even *arguendo* a *defensive* weapon. It seems plain from the total testimony of

Parsons that even if the riot baton is used exclusively as a defensive weapon, it is nonetheless likely to inflict injury. When used for what it is designed to be used it not only will inflict injury but is capable of inflicting great bodily injury.[1] I think a crucial finding is whether or not it is a weapon and primarily designed for use as such. Once that finding is made, it seems implicit that a further finding, which certainly is factual in this case, that the weapon may inflict great bodily injury, is unquestionably sufficient to meet the requirements of *Page*, and the applicable riot statute, SDCL 22–10–5.

I join in the opinion of Judge Miller for affirmance.

---

1. Parsons testified on direct examination: "The weapon is designed to be used to expose bony areas of the body, nerve centers or muscle groups, areas which will control an individual and may *incapacitate* an individual but which will not leave permanent damage." (Emphasis added)