STATE of South Dakota, Plaintiff
and Appellee,

v.

Dennis J. BANKS, Defendant
and Appellant.

No. 14769.

Supreme Court of South Dakota.

Considered on Briefs Oct. 22, 1985.

Decided April 30, 1986.

Bruce Ellison, Rapid City, for defendant and appellant.

John Guhin, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

MORGAN, Justice.

This is hopefully the final chapter of the Custer Courthouse riot which occurred in

Custer, South Dakota, in February 1973. Dennis Banks (Banks) was convicted of riot while armed, SDCL 22-10-5, and assault with a dangerous weapon, SDCL 22-18-11 (since repealed). The factual background has been presented before and will not be reiterated here unless pertinent. *See State v. Bad Heart Bull,* 257 N.W.2d 715 (S.D. 1977). On appeal, Banks basically raises three issues. First, that he was denied his right to a fair trial. Second, that the trial court failed to properly charge the jury on the count of riot while armed with a dangerous weapon. Third, that the conviction for assault with a dangerous weapon was against the weight of the evidence. We affirm.

 Banks initially contends that the trial court should have dismissed his indictment because of an inability to seat an impartial jury. Every defendant charged with a serious felony has a constitutional right to be tried by an impartial jury in the county in which the offense is alleged to have been committed. *In re Nelson,* 19 S.D. 214, 102 N.W. 885 (1902); S.D.Const. art. VI, § 7. In *Nelson,* this court stated: "Until the accused shall have been tried by such [an impartial] jury, or shall have waived his right by consenting to a change of place of trial, he cannot be lawfully convicted. If such a jury cannot be secured, there will be no tribunal before whom he can be tried[.]" 19 S.D. at 221, 102 N.W. at 887. Banks claims that no impartial jury could be found in Custer County and therefore the indictment should have been dismissed. Banks makes this claim on the basis of: (1) a stipulation by the attorney general in two separate cases that it would be difficult for the defendants in those cases to receive a fair trial in Custer County; (2) an order of the United States District Court transferring Banks' Wounded Knee trial from South Dakota because of the enormous prejudice against him in South Dakota; and (3) the dismissal of charges against Nuwi Nini, a defendant in a case involving the Minnehaha County Courthouse riot. Finally, on this issue, Banks contends that the dismissal of 247 veniremen for cause constituted a showing

of the impossibility of seating an impartial jury in Custer County. Banks, however, cites no authority for this final proposition.

 In this case, the trial court painstakingly undertook to seat an impartial jury. The court, sitting through voir dire, found that the publicity, although it was unfortunate, did not so invade the jurors' minds or cause them to form opinions or beliefs which would affect their judgment in this particular case. The United States Supreme Court in *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), found that whether or not the veniremen were acquainted with the case was "essentially irrelevant. The relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant[.]" 467 U.S. at 1035, 104 S.Ct. at 2891, 81 L.Ed.2d at 856. In *Patton,* "[j]ury selection ... took 10 days, seven jury panels, 292 veniremen, and 1,186 pages of testimony." 467 U.S. at 1027, 104 S.Ct. at 2887. 81 L.Ed.2d at 851. The Court held that the circumstances surrounding Patton's case did not reveal a " 'barrage of inflammatory publicity immediately prior to trial, ... amounting to a " 'huge ... wave of public passion'[.]" 467 U.S. at 1033, 104 S.Ct. at 2889, 81 L.Ed.2d at 855 (citations omitted).

Under *Patton,* the trial court's findings of juror impartiality may be overturned only for manifest error. *See Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). *See also Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) (wherein the Court noted that the extensive publication of news articles surrounding Murphy's case had ceased some seven months prior to the selection of the jury). Here, approximately 28 months elapsed between the Custer riot and Banks' trial. "[P]assage of time ... can be a highly relevant fact." *Patton,* 467 U.S. at 1035, 104 S.Ct. at 2891, 81 L.Ed.2d at 856.

Banks claims that the case of *State v. Nuwi Nini,* 262 N.W.2d 758 (S.D.1978), mandates that his indictment should have been dismissed. In *Nuwi Nini,* a Minnehaha County trial court dismissed the informations on the ground that a fair and impartial jury could not be obtained for the defendant within Minnehaha County. The charges in that case arose from a riot incident at the Minnehaha County Courthouse. That case, however, is of little precedential value for this court. On appeal, this court dismissed the State's contention that the informations should be reinstated only because we did not have jurisdiction to hear the appeal. The court specifically noted: "We do not reach a consideration of the merits in this case because without jurisdiction we are powerless to do so." *Nuwi Nini,* 262 N.W.2d at 762. In addition, this court has recently considered the question of pretrial publicity vis-a-vis an accused's right to a fair trial. *State v. Reutter,* 374 N.W.2d 617 (S.D.1985). In *Reutter,* we noted that "[t]he burden rests with the accused to establish that an impartial trial is not possible in the face of pretrial publicity." *Reutter,* 374 N.W.2d at 628 *citing State v. Reiman,* 284 N.W.2d 860 (S.D. 1979). We noted that the voir dire examination is the better forum for ascertaining the existence of hostility towards the accused. *Reutter, supra.*

Furthermore, we have not been provided with a complete transcript of the voir dire proceedings. If we draw any presumption from an incomplete settled record, the presumption is that the trial court acted properly. *State v. Hall,* 272 N.W.2d 308 (S.D. 1978). Accordingly, we cannot conclude that manifest error occurred which resulted in an unfair jury. *See Patton, supra.* Banks has not met his burden in establishing that the jury as seated was not impartial. Therefore, his claim must fail.

The second issue Banks raises regarding voir dire is that the court committed error when it refused to allow sequestered voir dire. In examining the jury, Banks was allowed to examine jurors individually, albeit with other jurors in groups of thirty-two persons present. Banks claims due to

pretrial publicity he needed to voir dire by examining venirepersons concerning their knowledge of the case. Banks claims that by refusing sequestered voir dire, an entire panel became tainted when he asked these questions.

"There is no 'right' or 'requirement' that prospective jurors be individually examined out of the presence of other jurors. That is a precautionary procedure which may be permitted, in the discretion of the trial court, in cases surrounded by massive publicity and involving controversial issues." *Bad Heart Bull,* 257 N.W.2d at 723. This court has recently reiterated that standard. *State v. Muetze,* 368 N.W.2d 575 (S.D. 1985). As this court noted in *State v. Shull,* 331 N.W.2d 284, 286 (S.D.1983), "individual voir dire is not a right but a procedure permitted in the discretion of the trial court."

A trial court has not abused its discretion in conducting voir dire when there is sufficient questioning to produce, in light of the factual situation involved in the particular trial, some basis for a reasonably knowledgeable exercise of the right to challenge. *United States v. Hasting,* 739 F.2d 1269 (7th Cir.1984). Here, the trial court ordered the jurors could be individually questioned but that the other jurors would be present. Thus, Banks was provided with a basis for a reasonably knowledgeable exercise of his right to challenge. *See Hasting, supra.* In view of the fact that the trial court found that an impartial jury was impaneled to hear Banks' case and Banks does not point to any specific juror who was seated to his prejudice, we cannot say that the trial court abused its discretion in refusing to allow individual sequestered voir dire examination.

As his third issue, Banks claims that a personal vendetta by the prosecutor, then attorney general Janklow, existed and that therefore the case should be dismissed. Banks, however, fails to cite to any case law warranting reversal on the basis of an alleged vendetta. Failure of

the brief to cite any supporting authority is a violation of SDCL 15–26A–60(6) and any issue thereby is deemed waived. *Corbly v. Matheson*, 335 N.W.2d 347 (S.D.1983). Additionally, Banks' claims of Janklow's personal vendetta are without any basis as there is no evidence in the record of any type of personal vendetta.

■ As a corollary to this issue, Banks claims that prosecutorial misconduct mandates a reversal of his conviction. He claims that extensive prosecutorial misconduct occurred in three different areas. First, the prosecution intimidated actual or potential defense witnesses. Second, there were improper contacts between the prosecution and these potential witnesses. Third, the prosecution destroyed evidence. Banks, however, fails to document any of the alleged intimidations. In *Reutter, supra*, this court stated: " 'If there was a factual basis for defendant's (sic) allegations of prosecutorial misconduct, that factual basis should have been presented to the trial court....' " 374 N.W.2d at 630 *quoting United States v. Wilson*, 715 F.2d 1164, 1170 (7th Cir.1983). Like the defendant in *Reutter*, Banks did nothing more than make mere allegations of prosecutorial misconduct on the basis of witness intimidation. As in *Reutter*, there is no factual support in the record for the allegations of witness intimidation. It should be noted that Banks' claims of witness intimidation relate to the fact that witnesses would be afraid to testify because they might be subject to arrest.[1] However, this is far from saying that the prosecution intimidated the witnesses into not testifying. The record is replete with Banks' allegations of prosecutorial misconduct. The majority of these allegations related to Janklow's aggressive campaign for attorney general. Much of Janklow's campaign literature concerned the violence attributed to the American Indian Movement, of which Banks was a national leader. This is a far cry from

Janklow or anyone else in the attorney general's office personally intimidating witnesses so that they would not testify. We find no evidence of prejudice and dismiss this claim.

■ Finally, under the issue of prosecutorial misconduct, Banks claims the trial court erred in refusing to dismiss the case for alleged irregularities in the grand jury. The basis of this claim revolves around a disappearance of taped testimony by the only two Indian witnesses before the grand jury.

If Banks' claim is that the prosecutor destroyed the tapes, there is simply no evidence of this fact. Banks has failed to make a proper showing on any claim of prosecutorial misconduct resulting from the disappearance of this testimony.

Banks' claim, however, may also be read in the light of disappearance of evidence per *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In essence, Banks claims a violation of his due process rights because the State did not disclose potentially exculpatory evidence.

Apparently, the court reporter who was present for the proceedings of the grand jury did not take the testimony of the two men. This testimony, however, was recorded by one of the members of the grand jury who had a tape recorder. The prosecutor obtained those tapes and asked the court reporter to transcribe them. For unknown reasons, the court reporter declined to transcribe the tapes and Janklow took the tapes with him. When the tapes were later transcribed, it was found that they did not contain the testimony of the two witnesses. Banks then made the motion to dismiss, based upon the fact that the tapes did not hold the testimony of the two witnesses.

In overruling the defense motions regarding the tapes, the court allowed Banks

---

1. Banks claimed "witnesses are afraid to come forward because the Attorney General has the power to arrest them on the spot for trumped up charges and certainly for no reason at all." July 23 Trial transcript at p. 63. This followed Janklow's telling Banks, off the record, that one of his witnesses would be arrested for perjury. This witness testified that she met Janklow at a "pot" party at his house.

to depose the two witnesses concerning their testimony before the grand jury and further granted the defense permission to arrange for the tapes to be tested in order to ascertain whether someone had tampered with them. Banks did not choose to avail himself of either of these opportunities.

> Whatever duty the Constitution imposes upon the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and also be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*California v. Trombetta,* 467 U.S. 479, 488, 104 S.Ct. 2528, 2534, 81 L.Ed.2d 413, 422 (1984) (citation omitted). As it is apparent that the missing testimony was not consciously destroyed, Banks must then meet the standard of *Trombetta.* This he fails to do. First, he must show that the evidence would be exculpatory. There is no evidence before the court concerning the nature of the testimony of the two witnesses. They did not testify at trial. Banks thus fails on the first prong of the test. Secondly, Banks fails on the second prong of the *Trombetta* test in that there were other means available to him to ascertain the nature of testimony given before the grand jury. The trial court allowed Banks to depose the two witnesses and also allowed Banks to test the tapes concerning their genuineness. Finally, as we noted in *Muetze, supra,* there was so much incriminating evidence that it is doubtful that Banks would have significantly profited from the disclosure of the missing grand jury testimony.

■ Banks also claims error because he and his defense counsel were not allowed to use facilities at the Pennington County Law Library.[2] The Library Association requires a $400 membership fee for use of its library facilities. Neither Banks nor his counsel were willing to pay this fee. We find this to be a frivolous issue. Banks cites no authority by which the trial court could have ordered the Library Association to waive or lower its membership requirements. Banks adamantly rejected representation by any local attorney, who might have been a member of the association and, more notably, he points to no specific instance where his representation was prejudiced. Finally, this contention was argued without authority and as this court stated in *Shull,* 331 N.W.2d at 285 n. 1, "[t]he failure to cite supporting authority is a violation of SDCL 15–26A–60(6) and the issue is thereby deemed waived." *See also Corbly, supra.*

Banks next claims his constitutional right to proceed pro se was offended when he was denied the right to personally voir dire venirepersons for two weeks. On June 16, voir dire commenced. On June 19, Banks stated: "I would like the Court's opinion as to whether I might be able to exercise my right to cross-examine prospective jurors." The trial court refused this request, and limited voir dire to Banks' attorney. On July 7, Banks renewed his request to proceed pro se, citing "the Supreme Court ... decision ... about going pro se." *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). At that time, the trial court, after questioning Banks about his qualifications, ruled: "I'll let you appear pro se to represent yourself and you may have the assistance of advisory counsel which will be court-appointed counsel or advisory counsel of your choice. I'll leave the court-appointed counsel remain to assist you in any way you wish them to assist you but as far as the examining of prospective jurors you may do that yourself if you wish."

■ *In State v. Thomlinson,* 78 S.D. 235, 238, 100 N.W.2d 121, 122–23 (1960), this court held: "If he is sui juris and

---

**2.** This library is set up and maintained privately by a number of lawyers in the Rapid City area. It is not an activity of Pennington County nor is it housed in the courthouse.

mentally competent an accused does have the right to defend himself without the aid and assistance of an attorney." Thomlinson had apparently conducted his own preliminary hearing. Upon arraignment in circuit court, without counsel, the trial court on its own motion appointed an attorney to confer and consult with him. At trial after the State's opening statement, Thomlinson requested permission to make his own opening statement, in which request his counsel concurred. The trial court denied permission. The trial court refused to honor the discharge of counsel and when counsel asked to make an opening statement on behalf of Thomlinson he did so and continued to represent him throughout the trial. The court went on to say:

"[Thomlinson's] rights were not violated by the appointment of counsel at the arraignment for the purpose of consulting and conferring with him. However, defendant thereafter clearly elected to defend himself in person. He did so with full knowledge and understanding of the danger and possible pitfalls of representing himself. He should have been allowed to do so.... Under the circumstances we believe the trial court erred in denying defendant his constitutional right to defend himself in person.

78 S.D. at 238, 100 N.W.2d at 123 (citation omitted). Inasmuch as Banks relies on *Thomlinson* as authority, his reliance is inappropriate. At all times, Banks had counsel and counsel of his own choosing. In fact, at one point, counsel of his choice was not available for a period of time and the trial court had refused to allow a continuance until counsel would be available, whereupon Banks made application to this court for an order directing the trial court to grant continuance. Pursuant to that, the trial was delayed an additional three weeks to permit him to have counsel of his choice available. Thereafter, it appears that on June 19, some three days into voir dire examination, Banks queried the court whether he would have a right to cross-examine the prospective jurors himself, apparently dissatisfied with the questions being asked by his counsel. This request was denied by the trial court. We do not find that this is any violation of *Thomlinson*, for, in that decision, we stated:

In all criminal prosecutions in this state an accused has both a constitutional and a statutory right 'to defend in person and by counsel.' S.D. Const. Art. VI, § 7, and SDC 34.2905(1). These provisions do not create or guarantee dual rights. When arraigned an intelligent competent accused must elect either (1) to have an attorney—by employment or appointment, or (2) to defend himself. He is not entitled as a matter of right to both.

78 S.D. at 237, 100 N.W.2d at 122 (citation omitted). Banks did not become entitled to defend himself in person until the occasion on July 7 when he notified the court he was discharging his counsel and requested to proceed pro se, *citing Faretta v. California,* which had been decided by the United States Supreme Court some seven days prior.

In *Faretta*, the United States Supreme Court inferred that the right to defend is personal. The Court went on to point out that when an accused manages his own defense he relinquishes many of the benefits associated with the right to counsel. The Court held specifically: "For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits." 422 U.S. at 835, 95 S.Ct. at 2541, 45 L.Ed.2d at 581 (citations omitted). In *Faretta*, as in *Thomlinson*, the trial court had forced Faretta to accept against his will a state-appointed public defender. Banks, on the other hand, wanted the best of both worlds. He wanted the benefits of counsel as well as the opportunity to represent himself. This apparently no court has ever said he is entitled to under either the state or federal constitution.

In *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), the United States Supreme Court held that the core of the *Faretta* right is that a pro se defendant is entitled to preserve actual control over the case he chooses to present to

the jury. Additionally, once a defendant has expressed his wish to appear pro se, participation of counsel must be limited so as not to destroy the jury's perception that the defendant is representing himself. After being apprised of Banks' desire to proceed pro se, the trial court did indeed allow Banks to represent himself. He examined the remaining venirepersons and presented the remainder of his defense.

■ Banks also contends that the trial court committed reversible error by failing to give an instruction that a riot baton was a dangerous weapon per se. Banks was convicted on one count of riot while armed. SDCL 22–10–5. The dangerous weapon Banks allegedly carried was a riot baton. In regards to this offense, the court gave the following instruction:

#### Instruction No. 28

It is provided by a statute of this State that any use of force or violence or any threat to use force or violence if accompanied by immediate power of execution, by three or more persons acting together and without authority of law, is a riot.

A person guilty of participating in a riot, who carried, at the time of such riot a dangerous weapon would be without authority of law.

The essential elements of the offense of riot while carrying a dangerous weapon as charged in indictment, each of which must be proved by the State beyond a reasonable doubt, are:

1. That the defendant acted, together with three or more persons without authority of law at the time and place alleged in the indictment.

2. That the defendant at that time and place carried a dangerous weapon.

3. That the defendant used force or violence or threatened to use force or violence accompanied by immediate power of execution.

*In State v. Page,* 15 S.D. 613, 91 N.W. 313 (1902), this court held that the legislative intent in enacting the forerunner to this particular statute was that the weapon designated under the statute be such as the court could say as a matter of law was a deadly or dangerous weapon. *See also State v. Robideau,* 262 N.W.2d 52 (S.D. 1978).

Banks fails to recognize that the trial court did indeed find that the riot baton was a dangerous weapon per se. The court stated:

I am not going to instruct the jury that it is a dangerous weapon per se because in the other indictment, assault with a dangerous weapon without intent to kill, the same weapon is alleged to have been used and in that charge it is a jury question as to whether or not it is a dangerous weapon so what I am going to do is submit the matter to the jury without instruction as to the fact that the court has found it to be a dangerous weapon per se.

In essence, what the court allowed the jury to do was to make a determination of whether the riot baton was a dangerous weapon for the riot-while-armed charge under the instruction given for the assault charge. That instruction stated:

#### Instruction No. 13

A dangerous weapon is any object, instrument or weapon which in the manner in which it is used or attempted to be used, is capable of producing and is likely to produce either death or great bodily injury.

Banks actually benefitted from the fact that the court did not instruct the jury that the riot baton was a dangerous weapon per se. Thus, the State was burdened with proving twice the dangerousness of the riot baton in the riot-while-armed charge. The trial court had the authority to instruct the jury that it was a dangerous weapon per se. *See Robideau, supra.* If he had, Banks would have argued that it was error with respect to the assault charge. If any error occurred, it was harmless, since it did not affect Banks' rights. *See* SDCL 23A–44–14; *State v. Reed,* 387 N.W.2d 10 (S.D.1986).

■ Banks finally contends that his conviction for assault with a dangerous weapon was without evidentiary support. In *State v. West*, 344 N.W.2d 502, 503, 505 (S.D.1984), this court said:

In determining the sufficiency of evidence on appeal, the question presented is whether or not there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In making such a determination, this court will accept that evidence, and the most favorable inferences that can be fairly drawn therefrom, which will support the verdict.

The record is replete with testimony regarding Banks' participation in the riot and assault. Highway Patrolman Dale Stoner testified that he was struck on the arm with a riot baton and sustained a bruise on the wrist from Banks. Moreover, Banks took a second swing at the patrolman, but missed. Drawing the most favorable inferences from the evidence, there is more than enough evidence to support the verdict.

Accordingly Banks' convictions should be affirmed.

FOSHEIM, C.J., and HERTZ, Circuit Judge, acting as a Supreme Court Justice, concur.

HENDERSON and WUEST, JJ., concur with writings.

SABERS, J., not having been a member of the Court at the time this action was submitted to the Court, did not participate.

HENDERSON, Justice (concurring).

In agreeing with this opinion in its substantive content, I feel compelled to assert some historical background and facts to illuminate the proceedings preceding this appeal.

This appeal was prompted by a jury verdict returned on July 26, 1975. Prior to sentencing, appellant became a fugitive of justice and obtained asylum for many years in the State of California. Later, he fled from the State of California and took up sanctuary on an Indian Reservation in the State of New York. To his credit, he sought a conciliation with the law and surrendered himself to authorities in the State of South Dakota, whereupon a judgment of conviction was entered on October 8, 1984, sentencing him to two concurrent three-year terms of imprisonment.

It should be noted that during his jury trial, which lasted from July 10 to July 26, 1975, the circuit judge who sentenced appellant directed a verdict of not guilty of arson to the Chamber of Commerce building in Custer, South Dakota, which was burned to the ground. It should be further noted that the jury, selected to hear this case, acquitted appellant of arson with regard to the Custer County Courthouse, Custer, South Dakota, which was also set ablaze on February 6, 1973. This same jury acquitted appellant of the burglary of two law enforcement vehicles. Thus, it would appear that the jurors exhibited an ability and willingness to ignore pretrial publicity and decided the guilt or innocence of appellant under the facts presented during the trial. It appears that this Custer County jury did have a state of mind which accorded a presumption of innocence unto appellant and judged him under the evidence received according to the court's instruction. Notwithstanding appellant's protestations of an unfair trial, the conclusion leaps out that appellant was accorded his constitutional right in that respect.

On his two concurrent three-year terms of imprisonment, appellant began his confinement in the State Penitentiary on October 8, 1984, and was released on supervised parole on December 9, 1985. Therefore, his incarceration totaled one year and two months.

In his brief, submitted by famous counsel of New York and well-known, able defense counsel of South Dakota, appellant reminds us of his remarks to the trial court that he had returned to face his sentence because he wanted "to help build South Dakota ... because progress is too slow—progress of trying to bring together Indian people and white people is too slow." This,

appellant expressed in a spirit of reconciliation when he was sentenced. Now, the Board of Pardons and Paroles has granted him an opportunity to make his words good. Let us hope that appellant lives up to his words.

WUEST, Justice.

I concur in this opinion. However, footnote 1 should be eliminated because it adds nothing to the opinion, and unnecessarily casts aspersion on a public official.