**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Robert Dean TAPIO, Defendant and Appellant.**

**Nos. 16634, 16653.**

Supreme Court of South Dakota.

Argued March 21, 1990.

Decided July 11, 1990.

See also, 432 N.W.2d 268.

**408**

M. Bridget Ryan, Asst. Atty. Gen., Pierre (Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief), for plaintiff and appellee.

George E. Grassby of Whiting, Hagg & Hagg, Rapid City, for defendant and appellant.

MORGAN, Justice.

Robert Dean Tapio (Tapio) appeals a judgment rendered on a jury verdict convicting him of second-degree murder, arising from his participation in the death of Chris Janis (Janis). This is a companion case to *State v. Brings Plenty*, 459 N.W.2d 390 (# 16613 in conference). We affirm.

Janis' death resulted from a bludgeoning at the hands of Tapio and Blaine Brings Plenty (Blaine) in the front yard of Vera Brings Plenty's (Vera) home at 12 Neptune in Rapid City. The general background as found in the record is detailed in *Brings Plenty, supra,* and additional facts will be supplied where relevant to the discussion of the issues.

Tapio was charged by Information with four alternative homicide counts: (1) premeditated first-degree murder (SDCL 22-16-4); (2) second-degree murder by acts imminently dangerous to others and evincing a depraved mind (SDCL 22-16-7); (3) first-degree manslaughter in a heat of passion, but in a cruel and unusual manner (SDCL 22-16-15(2)); and, (4) first-degree manslaughter by means of a dangerous weapon (SDCL 22-16-15(3)).

The jury returned a guilty verdict of second-degree murder, a violation of SDCL 22-16-7. Tapio was sentenced to serve life without parole in the state penitentiary.

On appeal, Tapio raises four issues:

1. Whether the trial court erred in not instructing on lesser included offenses of second-degree manslaughter, aggravated assault, simple assault, and attempts to all offenses charged and proposed.

2. Whether the trial court erred in allowing Tapio to be impeached with custodial statements that were held to be in violation of his *Miranda* rights.

3. Whether the trial court abused its discretion when it refused to allow Tapio to individually question and sequester potential jurors.

4. Whether the trial court abused its discretion in admitting photos and evidence seized at the scene.

By notice of review, the State raises the following issue:

Whether the trial court was clearly erroneous and/or erred as a matter of law in excluding Tapio's post-*Miranda* statements.

In his first issue, Tapio claims that second-degree manslaughter (SDCL 22-16-20), aggravated assault (SDCL 22-18-1.1(2) and (4)), and simple assault (SDCL 22-18-1(2) and (3)), should have been given as lesser included offenses of the crimes charged. He also claims that instructions on attempted first-degree murder, attempted second-degree murder, and attempted first-degree manslaughter should have been given.

■ This court has approved a legal and factual test for determining whether the trial court should have submitted a lesser included offense instruction to the jury. *State v. Gillespie*, 445 N.W.2d 661 (S.D. 1989); *State v. Scholten*, 445 N.W.2d 30 (S.D.1989); *State v. Gregg*, 405 N.W.2d 49 (S.D.1987). Because we have held that the trial court is not required to instruct the jury even as to those offenses which might be included offenses under the legal test, but which the evidence would not warrant, *State v. O'Connor*, 86 S.D. 294, 194 N.W.2d 246 (1972), and because we find the factual test dispositive, we look to that test first. In discussing the factual test, we have stated:

Where a request has been made to charge the jury on a lesser-included offense, the duty of the trial judge is determined by the evidence. If evidence has been presented which would support a conviction of a lesser charge, refusal to

give the requested instruction would be reversible error.... There must be *sufficient* evidence, however, when read in the light most favorable to the defendant, which would justify a jury in concluding that the greater offense was not committed *and* that a lesser offense was, in fact, committed. (Emphasis in original.)

*Scholten,* 445 N.W.2d at 32 (citing *State v. Rich,* 417 N.W.2d 868 (S.D.1988)). *See also Gregg, supra; State v. Woods,* 374 N.W.2d 92 (S.D.1985). "A trial court is not required to instruct on matters that find no support in the evidence...." *State v. Wilson,* 297 N.W.2d 477, 482 (S.D.1980); *State v. Kafka,* 264 N.W.2d 702, 703 (S.D.1978).

In fact, this court has cautioned that a lesser included offense instruction deemed unnecessary, factually or otherwise, may be considered detrimental to the jury process. In *State v. Feuillerat,* 292 N.W.2d 326, 334 (S.D.1980) (citation omitted), this court stated, as follows:

> The early cases point out and emphasize and we must stress again, because the question keeps recurring, that a determination of whether an instruction on a lesser included crime should be given to a jury is not solved by merely determining the crime charged includes the lesser offense because juries are not to be given the discretion or freedom to pick and choose what offense the accused should be found guilty of. The evidence must throw doubt upon the greater offense.... Juries cannot rightly convict of the lesser offense merely from sympathy or for the purpose of reaching an agreement. They are bound by the evidence and should be limited to those included crimes which a reasonable view of the evidence will sustain and does not convince beyond a reasonable doubt the additional element of the greater crime existed.

*See also Rich, supra.* In light of the above, a jury is properly restricted as to the spectrum of criminal activity it may consider when the evidence warrants instruction only on the greater offenses.

 With these principles in mind, we examine Tapio's arguments. It is Tapio's contention that he was only involved in the first fight with Janis where Janis sustained minor injuries. Assuming, for the determination of the propriety of the instructions, that this were the case, Tapio could still be found guilty of the death of Janis because he acted at least as an aider and abettor.[1] Tapio's actions in beating Janis initially weakened him so he could not protect himself during the subsequent clubbing. Furthermore, Tapio's participation in stopping Cameron Red Star—who, having observed the beating of Janis from the trailer at 12 Neptune, left to summon the police, only to be beaten to the ground by Tapio and Blaine—allowed the beating of Janis to continue. *Graham v. State,* 346 N.W.2d 433 (S.D.1984) (robbery plan called for knocking victim out, still aider and abettor to murder though did not strike blow); *State v. Schafer,* 297 N.W.2d 473 (S.D. 1980) (keeping watch in car a safe distance from burglary still made defendant guilty of burglary). Since Janis died and Tapio could have been found guilty as an aider and abettor, it would have been inappropriate to instruct on aggravated or simple assault or the attempted homicide instructions. *Gregg, supra.* Simply put, once there was a death, the attempt charges became moot. Additionally, contrary to Tapio's argument, there is no offense of attempted second-degree murder. *State v. Lyerla,* 424 N.W.2d 908 (1988), *cert. denied* 488 U.S. 999, 109 S.Ct. 774, 102 L.Ed.2d 767 (1989).

 Next, Tapio suggests that the jury should have been instructed on the assault charges and attempts because medical personnel's failure to resuscitate Janis after he stopped breathing was the proximate cause of his death. State counters that Tapio waived this issue by failing to cite authority for the position. We agree. *Massey Ferguson Credit Corp. v. Bice,* 450

---

1. SDCL 22–3–3 provides: "Any person who, with the intent to promote or facilitate the commission of a crime, aids, abets or advises another person in planning or committing the crime, is legally accountable, as a principal to the crime."

N.W.2d 435 (S.D.1990); *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114 (S.D.1977).

Finally, the second-degree manslaughter instruction was properly rejected. Tapio concedes that if testimony of Lori Brings Plenty (Lori), Ollie Brings Plenty (Ollie), and Vera (all witnesses who observed the beating from the trailer) is believed, there would be sufficient evidence to convict him of second-degree murder, since their testimony established that he took part in beating Janis with clubs. Tapio seeks, however, to discredit their testimony. In Lori's case, he claims that he could not see the events clearly; in Ollie's case, he claims that she lied about events early on, therefore, everything she says is unbelievable; and, in Vera's case, he claims she recanted everything she said and asserts that she was not present. These arguments go only to the weight of the testimony, which the jury properly considered. *State v. Huber*, 356 N.W.2d 468 (S.D.1984); *State v. Peck*, 82 S.D. 561, 150 N.W.2d 725 (1967). They do not negate that the greater offense was committed. Moreover, there was overwhelming direct and circumstantial evidence to substantiate the second-degree murder charge.

Clearly then, the factual test was not met because there was evidence that the greater offense was committed. Without overcoming this first hurdle, Tapio had no right to request the lesser offense of second-degree manslaughter. *Scholten, supra; Gregg, supra.*

Tapio's second issue contends that his due process rights were violated when the trial court permitted use of his custodial statements for impeachment purposes. He premises his arguments on three factors: inadequate *Miranda* warnings, lack of a knowing and intelligent waiver of the *Miranda* safeguards, and involuntariness. The factual background for Tapio's second issue is that he was interrogated on three separate occasions by Detective William Egan (Egan) of the Rapid City Police Department: first at the police department at about 1:00 a.m. on January 10, 1988, for approximately one-half hour; then again two hours later, around 3:00 a.m., for one-half hour; and, finally, at the Pennington County Jail on January 11, 1988, at about 8:30 a.m., for approximately fourteen minutes. This is the same Detective Egan who interrogated Blaine, using somewhat the same technique.

At the initial interrogation, Tapio was given only partial *Miranda* warnings. Specifically, Egan failed to warn Tapio that he had the absolute right to remain silent; that he had the right to the physical presence of an attorney; and that he could stop questioning at any time. During questioning, Tapio admitted being in a fight with Janis.

After a pretrial hearing, the trial court entered an order suppressing Tapio's statements for use in State's case-in-chief because of improper psychological inducements and defective *Miranda* warnings. However, it ruled that State had met its burden of proving beyond a reasonable doubt that under the totality of the circumstances Tapio's statements were voluntary and could be used for impeachment.

Tapio first argues procedurally that the statement should not have been used for any purpose because the trial court first stated in a memorandum opinion that the statements were involuntary and, then, while incorporating the memorandum into its findings of fact and conclusions of law by reference, still concluded that the statements were voluntary. State argues that the memorandum opinion was superseded by the findings and conclusions. We agree.

We have stated many times that it is the trial court's prerogative to re-think a decision from the bench or a memorandum decision. *Hitzel v. Clark*, 334 N.W.2d 37 (S.D.1983). While it is true that the trial court incorporated its memorandum opinion by reference, we believe the specific findings and conclusions supersede the memorandum and articulate the trial court's final and determinative thoughts on the voluntariness issue.

The trial court agreed with Tapio on the first two premises relating to the *Miranda* warning and restricted the State

from using the statements in their case-in-chief. In *Brings Plenty, supra,* we discussed the application of the prophylactic *Miranda* rule as opposed to the Due Process suppression rule where the statements are determined to be involuntary.

The United States Supreme Court, in *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), held that a defendant may be impeached with a *voluntary* statement obtained without proper *Miranda* warnings. But the Court held in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), that a statement that is procured by overbearing a suspect's free will is coerced and involuntary, thereby violating a suspect's constitutional Fifth Amendment and Fourteenth Amendment rights to due process. As applied to this issue, the Court has stated further:

> [A] defendant's compelled statements, as opposed to statements taken in violation of *Miranda,* may not be put to any testimonial use whatever against him in a criminal trial. "But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law." (Emphasis in original.)

*New Jersey v. Portash,* 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501, 510 (1979) (citation omitted) (footnote omitted).

We then look to the trial court's determination of voluntariness. Our scope of review on voluntariness of confessions was recently reaffirmed by a majority of this court in *State v. Jenner,* 451 N.W.2d 710, 716 (S.D.1990) (citations omitted), wherein it is said:

> The State has the burden of proving beyond a reasonable doubt that such confessions or incriminating statements were freely and voluntarily made. If the trial court finds the confession or incriminating statements were voluntary beyond a reasonable doubt, such finding is binding upon this Court unless we conclude from our review of the record that the finding is clearly erroneous. The trial court must have reviewed the totality of the circumstances surrounding the interrogation. In reviewing the trial

court's findings on voluntariness, we consider the evidence in the light most favorable to the finding.

To decide whether the trial court was clearly erroneous in finding Tapio's statements voluntary, we look to traditional due process analysis. *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

In determining whether Tapio's will was overborne, traditional due process analysis requires us to look at the following factors:

> "[T]he duration and conditions of detention, ... the manifest attitude of the police toward him, his physical and mental state, the diverse pressures which sap or sustain his powers of resistance and self-control."

*Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 965–66 (1987) (citation omitted). In *State v. Hinz,* 78 S.D. 442, 450–51, 103 N.W.2d 656, 660–61 (1960), we provided factors to consider in judging whether psychological coercion had overcome a defendant's free will:

> Among these factors are the defendant's age, his character, his record as to former crimes, educational background, and mental capacity; the legality or illegality of his arrest; the conditions of his incarceration; delay in arraignment; his removal to a distant jail; prolonged questioning of the accused by the police, especially when accompanied by deprivation of refreshment, rest, or relief, or when done by police officers working in relays; his being kept isolated by the police for a substantial period of time; lack of aid by counsel, or friends, or relatives, or disinterested persons; failure on the part of the police to warn the accused that his statements might be used against him, and to advise him as to his rights, such as his right to remain silent, or to secure a lawyer, or to request a preliminary hearing.... Annotation[, Admissibility of Pretrial Confession in Criminal Case,] 1 L.Ed.2d [1735,] 1742.

Using those criteria, the trial court was not clearly erroneous in deciding that Tapio's free will was not overborne. Though Tapio's blood alcohol content was .164, Egan did not feel Tapio was intoxicated

and Tapio seemed to understand the questions put to him. Tapio was not threatened with any consequences if he did not talk. Egan said he would share Tapio's truthfulness with the state's attorney's office, but he did not *specifically* offer promises or leniency if Tapio talked to him. At the suppression hearing, no medical testimony was offered regarding any head injuries Tapio may have had, although officers testified that Tapio said the right side of his head hurt. Tapio was then given partial *Miranda* warnings and he said he understood such rights. He related that he completed the twelfth grade and currently had a good job with the Johnson program. He had a prior felony conviction and thus was experienced with the criminal court system. After the warnings, Tapio was asked if he had any problem talking about the incident and he replied negatively. During the interview on January 11, 1988, Tapio was again read his rights. He acknowledged they were the same rights given the night before and said he had no problem talking about the incident. Each of the interrogations was of relatively short duration. The first interview with Tapio lasted about thirty minutes; the second about thirty-six minutes, and the third about fourteen minutes.

Viewed in totality and in a light most favorable to the trial court, the finding that Tapio's statement was voluntary was not clearly erroneous. Therefore, Tapio's statements were properly used for impeachment purposes. *Elstad, supra; Harris, supra.*

The third issue arises from the trial court's denial of Tapio's request for individual, sequestered voir dire examination of the prospective jurors. Tapio claims this was necessary due to the extensive publicity surrounding the state's attorney's challenge of the trial judge as well as publicity focused on the co-accused, Blaine Brings Plenty. State counters that Tapio waived this issue by failing to provide authority for his position. Alternatively, State claims there was no abuse of discretion because Tapio had failed to show that he did not receive a fair and impartial jury.

We will not overturn a trial court's procedure in conducting voir dire unless it is shown that the court abused its discretion by not permitting a defendant "some basis for reasonably knowledgeable exercise of the right to challenge." *State v. Banks,* 387 N.W.2d 19, 22 (S.D.1986) (citation omitted); *State v. Muetze,* 368 N.W.2d 575 (S.D. 1985); *State v. Shull,* 331 N.W.2d 284 (S.D. 1983).

■ Tapio did not waive this issue. Contrary to State's assertion, he cited *State v. Pickering,* 245 N.W.2d 634 (S.D.1976); *State v. Nagele,* 80 S.D. 625, 129 N.W.2d 537 (1964); and *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), all of which stand for the proposition that the defendant's right to a fair and impartial jury must be protected by his voir dire process. Having decided that Tapio preserved the issue, we move to the specifics of his argument.

■ First, there is no right to individual, sequestered voir dire. *Banks, supra.* Though a trial judge may choose to use this precautionary procedure in cases "'surrounded by massive publicity and involving controversial issues,'" it is not required. *Banks,* 387 N.W.2d at 22; (citing *State v. Bad Heart Bull,* 257 N.W.2d 715, 723 (S.D.1977)); *Shull, supra.*

■ Though Tapio claims he was precluded from conducting individual voir dire to determine media exposure, such is not the case. Panels of twelve potential jurors were seated and available for individual questioning. Tapio chose, as a matter of trial strategy, not to individually question jurors for the alleged fear of poisoning the minds of the other potential jurors. His conduct, not that of the trial court, precluded questioning. As we stated in *Banks:*

> Here, the trial court ordered the jurors could be individually questioned but that the other jurors would be present. Thus, Banks was provided with a basis for a reasonably knowledgeable exercise of his right to challenge.

387 N.W.2d at 22.

Second, we specially address Tapio's argument that he was prejudiced because

several of his jurors also were in the pool of jurors for Brings Plenty's trial. In *State v. Connor*, 86 S.D. 578, 582, 199 N.W.2d 695, 697 (1972) (citation omitted), we stated:

Assuming that defendant is correct in his assertion that at least some of the members on his jury must have heard about his involvement by reason of being present during the voir dire of [his co-accused's] jury, it does not follow that defendant did not receive a fair trial. He was entitled only to a fair and impartial jury, not a jury composed of individuals who had absolutely no prior knowledge of the facts of his case.

Likewise, absent any showing by Tapio that his jurors could not be fair and impartial, he has not raised his argument above conjecture. All of the jurors assured the trial court that they could be fair and impartial. The four jurors who had heard about the case through the media said they would not be affected by what they had heard and had formed no opinions about the case. Therefore, we do not find that the trial court abused its discretion by not allowing individual sequestered voir dire. *Banks, supra; Muetze, supra; Shull; supra; Connor, supra.*

Just as in *Brings Plenty*, Tapio raises the issue of abuse of discretion on the part of the trial court in failing to suppress certain evidence seized at the home at 12 Neptune, where Tapio was an overnight guest. We consider this issue against the following factual background.

Approximately an hour after the original police response, Detective Harold Plooster (Plooster) arrived at 12 Neptune. Several officers were there protecting the scene at this time. Officers Nelson and Burdick told Plooster what had happened. They showed him the yard area and the inside of the trailer. Several people were in the trailer, including Lori, Ollie, and Vera, as well as Millard Brings Plenty and Leo Brings Plenty. While briefly looking inside the trailer, Plooster saw a wood splinter and earring on the kitchen floor and picked them up. Plooster then went outside and took some photographs. Plooster came

back inside the trailer. At this time, Plooster asked Vera for permission to search additional areas of the trailer and she agreed. This search produced, in part, a club found in the bedroom closet of the middle bedroom and a wet bed covering taken from the middle bedroom. Photographs were taken before and after the additional oral consent was given. Later that morning (approximately 6 a.m.), Plooster asked Vera to sign a permission to search form. Vera, who can read, signed the consent form and Ollie witnessed it.

Tapio made a pretrial motion to suppress all the evidence collected at the scene. He alleged that the evidence should have been suppressed as the fruit of a warrantless search of the trailer house and of the curtilage. The trial court denied the motion to suppress, ruling that Tapio had no standing to object to the search because he was a resident of the Golden Hills Motel at the time of the search. Moreover, it found that physical evidence seized outside the trailer was appropriately seized because the items were in plain view and that the searches inside were conducted with the consent of Vera, the actual lessee of the premises.

Our scope of review on a motion to suppress is whether the trial court abused its discretion. *State v. Bartlett*, 411 N.W.2d 411, 414 (S.D.1987). As to any factual determination, our scope of review is the clearly erroneous standard. *Woods, supra.* On appeal, this court must determine whether the trial court's findings are against the weight of the evidence. *Id.*

We start by noting that the test on the standing issue was not whether Tapio may have had another residence, but whether he had a reasonable expectation of privacy for the trailer. *State v. Thomale*, 317 N.W.2d 147, 149 (S.D.1982) (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Just this term, the United States Supreme Court settled the standing issue for overnight guests when it stated: "We need go no further than to conclude, as we do, that [the defendant's] status as an overnight guest is alone enough to show that he had an expectation of privacy in the

home that society is prepared to recognize as reasonable." *Minnesota v. Olson,* —— U.S. ——, ——, 110 S.Ct. 1684, 1688, 109 L.Ed.2d 85, 93 (1990).

 Here, Tapio was staying overnight at the trailer with his girl friend Ollie, as an overnight guest. They stayed in the middle room where the sheet was taken from the bed. As such, Tapio had standing to contest the search. *Olson, supra.* With this hurdle cleared, we examine the substantive objections to the searches, starting with the search of the trailer.

 It is a well-recognized exception to the warrant requirement that a party may give consent. *Woods, supra,* at 99–100 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Furthermore, consent may be given by a third person who has "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974) (footnote omitted).

Whether consent to search has been voluntarily given "is a question of fact to be determined from the totality of the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 862; *Woods, supra.* State has the burden of showing voluntariness by clear and convincing evidence that the search was the result of a free, intelligent, unequivocal and specific consent without any duress or coercion, actual or implied. *Id.*

The initial search was occasioned when Vera summoned police to 12 Neptune by a 911 call for help because someone was being killed. She directed police into the trailer to find "the guys who did it." Once inside, she identified Blaine and Tapio as the assailants. Vera's words and conduct clearly invited police officers to enter her home and investigate. *Woods, supra.* Plooster testified that he updated the earlier consent given to Officers Nelson and Blenner when he arrived at the scene. Plooster specifically asked Vera if he could look around the trailer and she agreed and ultimately signed the written consent.

Tapio contends that Vera's consent to the search was nonconsensual because she was subjected to misrepresentations and intimidation, and because she was given the impression that she had no alternative but to sign the consent form at 6 a.m. The record does not indicate that anyone exerted physical coercion or official pressure on Vera to make her sign the form, which she admitted that she had signed after reading the same. No threats were made or weapons shown. *State v. O'Brien,* 272 N.W.2d 69 (S.D.1978). Tapio's argument ignores all of her actions before signing the consent. Nor do we find a problem with the continuing search. No objection or revocation of consent was ever manifested by Vera. Finally, Vera testified that she read and executed the consent to search form which confirmed any earlier oral consent.

Under the totality of the circumstances, we do not find that the trial court abused its discretion in admitting this evidence. *Bartlett, supra.* All evidence seized and photos taken inside the trailer were admissible because of Vera's valid consent. *Matlock, supra; Schneckloth, supra; Woods, supra.*

 We next examine the admissibility of the evidence seized outside the trailer. For all of the reasons stated with regard to the evidence seized in the trailer, anything observed or seized in the curtilage of the trailer at 12 Neptune is deemed admissible by Vera's consent. Vera's phone call and her subsequent actions constituted a consent to search the curtilage of 12 Neptune. *Woods, supra.*

 Alternatively, the evidence seized in the curtilage was in plain view. In *State v. Martin,* 274 N.W.2d 893 (S.D.1979) *cert. denied* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 112 (1979), this court found that evidence observed at the initial entry into a *residence* in an emergency situation was admissible. *See also State v. Bittner,* 359 N.W.2d 121 (S.D.1984). Here, shortly after the police arrived, the murder weapons (clubs) were observed *outside* the residence. They were appropriately seized under the plain view exception. Likewise, the photographs of the scene were admissible

as a mere continuation of the first search conducted pursuant to Vera's oral consent. *Martin, supra.*

By notice of review, State raises the issue of whether the trial court erred in excluding Tapio's post-*Miranda* statement. It is State's argument that the *Miranda* warning, as given by Detective Egan, was adequate. The trial court specifically found that Egan failed to warn Tapio that he had the absolute right to remain silent; that he had the right to the physical presence of an attorney; and that he could stop questioning at any time.

 We are not in complete agreement with the trial court's findings in regard to the *Miranda* deficiencies. *California v. Prysock,* 453 U.S. 355, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981), instructs us that *Miranda* does not require a precise formulation of the warnings given a criminal defendant or a talismanic incantation but, rather, that the warning reasonably convey to a defendant his rights as required. In our view, the language used by Egan: "You have the right to consult with and the presence of an attorney" satisfies the requirement that he be advised of the right to have an attorney present prior to any questioning. The fact that Egan had begun the questioning before stating the right, and testified later that he would not know how to get Tapio an attorney at that point if he had requested one, go to the form of the warning, not the substance thereof. To that extent, we disagree with the trial court's ruling. But it is clear that Tapio was not advised that he could terminate the questioning at any point that he wished, so there was a deficiency in the substance of the *Miranda* warning given, as well as the form. Therefore, applying the clearly erroneous standard of review, we determine the trial court properly excluded the use of the statement in the State's case-in-chief.

Affirmed.

WUEST, C.J., HENDERSON and MILLER, JJ., concur.

SABERS, J., concurs specially in part and dissents in part.

SABERS, Justice (concurring specially in part and dissenting in part).

Although I agree generally with the majority's treatment of Issue I relating to lesser-included offenses, I am still convinced that there *is* an offense of attempted second-degree murder under South Dakota law. SDCL 22–4–1; SDCL 22–16–7. See my dissent in *State v. Lyerla,* 424 N.W.2d 908, 913 (S.D.1988), *appeal dismissed and cert. denied,* 488 U.S. 999, 109 S.Ct. 774, 102 L.Ed.2d 767 (1989). Therefore, I concur specially on this issue.

I would decide Issue II—Use of Involuntary Statements for Impeachment of Defendant—consistent with our treatment of the same issue in *State v. Brings Plenty,* 459 N.W.2d 390 (S.D.1990), because, based on the totality of the circumstances, the statements were, in fact, involuntary. Since the determination of Issue II in this manner would resolve Issue V (State's Notice of Review), I would not reach Issues III and IV.