#24812-a-DG

**2009 SD 36**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

ORLANDO TIBBS FOOL BULL,                 Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE GLEN A. SEVERSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota                     Attorneys for plaintiff
                                         and appellee.

NICHOLE CARPER
Sioux Falls, South Dakota                Attorney for defendant
                                         and appellant.

* * * *

CONSIDERED ON BRIEFS
ON FEBRUARY 17, 2009

OPINION FILED **05/13/09**

#24812

GILBERTSON, Chief Justice

[¶1.]     Orlando Tibbs Fool Bull (Orlando) was tried along with Jade Jarvis Fool Bull (Jade) and Willard Nolan Makes Room For Them (Willard) (Defendants collectively) on three counts of Burglary in the First Degree – Inflict Injury on Another and one count of Burglary in the First Degree – Committed in Night Time. The jury found Orlando guilty on all charges. Orlando appeals. We affirm.

**FACTS**

[¶2.]     At 3:24 a.m. on May 19, 2007, Sioux Falls Police Department Metro Communication received a telephone call from a female caller alerting police to a disturbance in progress at 614 South 2nd Avenue, Apartment 3 in Sioux Falls, South Dakota. At 3:26 a.m., Sergeant David McIntyre received a dispatch for a burglary in progress at the same location and arrived at the scene within minutes. Upon his arrival, Sergeant McIntyre saw a male wearing white shorts and a white shirt running from the structure in which Apartment 3 was located. As Sergeant McIntyre approached the house on foot, another male walked from behind the house and into view.

[¶3.]     Officers on the scene located the male in the white shorts and white shirt hiding in nearby bushes. This individual was identified as Edward Cottier (Ed), a resident of the apartment in question. Ed had a bloody nose and looked to have been hit in the face several times.

[¶4.]     Officer Bruxvoort found William Cottier (Billy), Ed's brother, inside the apartment. Billy was sitting on the living room floor and appeared to be injured. He was having difficulty talking and breathing due to pain in his ribs.

-1-

[¶5.] Officer Bruxvoort interviewed Billy and was told that Billy and his girlfriend Amanda Armijo (Amanda) had come over to Ed's apartment for the evening. Amanda invited two female friends, Shawna Peasley (Shawna) and fifteen year old J.P. to the gathering. Shawna and J.P. arrived around 12:30 a.m. At approximately 1 a.m., Ed and Billy's younger sister L.B.B. arrived with her boyfriend, Jade. The young people were with Ed who was watching his infant son while his girlfriend was at work. Billy then told Officer Bruxvoort that L.B.B. felt ill and went into the bedroom to lie down. While she was out of the room, Jade began kissing and making advances toward J.P.

[¶6.] Billy and Ed confronted Jade and told him to go and be with their sister or leave. Jade became defiant, and told the Cottier brothers that he was a Fool Bull, that he had his "homies a block away," and that "all he needed to do was make a phone call." Jade and Billy almost came to blows. Ed broke the tension and Jade eventually left the apartment.

[¶7.] At around 3 a.m., Shawna, J.P., Billy, and Amanda decided to stay the night and found places to lie down to watch a movie or sleep. Billy and Amanda were on the couch, and Ed was in a recliner. The occupants woke to the sound of the backdoor being forced open and breaking glass. Three men and one woman charged into the apartment. Billy identified the intruders as Jade, Orlando, Willard, and Joyce Ross (Joyce), Orlando's girlfriend.

[¶8.] What ensued next was contested at trial, and the stories of the respective witnesses did not agree completely internally or with each other. In addition, the details of the stories changed from the time statements were given to

police to the time of trial.  All the occupants agreed, however, that Joyce, Jade, Orlando, and Willard rushed into the apartment.

[¶9.]    Willard punched Ed in the mouth as Ed was trying to get out of his recliner.  Willard continued to punch Ed until Ed was knocked to the floor.  Orlando punched Billy knocking him to the floor.  Willard and Orlando lifted a glass table top and dropped it on Billy.  Jade yelled to Orlando to "Fuck him up.  Fuck him up" during the assault on Billy.

[¶10.]   While Ed and Billy were being assaulted, Amanda tried to grab her cell phone to dial 911.  Jade knocked the phone from her hand, and when Amanda tried to pick it up Joyce knocked it out of her hand.  Joyce then said "We got to go.  We don't want to catch a murder rap."

[¶11.]   In the meantime, Amanda was finally able to dial the police.  She told police four men and a woman had invaded the home.  As Amanda made the call, the intruders started leaving.  As the intruders were leaving, Jade got into L.B.B.'s face and said "I wasn't here and you didn't see me here."  Jade also tried to get L.B.B. to leave with him, but she was unwilling.

[¶12.]   Police interviews with L.B.B. and Ed were videotaped at the scene by the patrol car onboard cameras.  L.B.B. was taken to juvenile lockup after her interview, as she was a minor and had run away from her mother's home three weeks prior.  L.B.B. had been staying with Jade at the homes of friends and family during the three weeks she was on the run.  L.B.B. was also administered a Portable Breath Test (PBT).  The results of that PBT were documented in L.B.B.'s

CHINS (Child in Need of Services) file, but not the police report for the home invasion and assaults.

[¶13.] The State elected to try three of the defendants, Jade, Orlando, and Willard together. Joyce's trial was severed. At a pretrial motion hearing, the State indicated that it intended to elicit testimony that one or more of the defendants made the following comments: "My homies are a block away" and "I'm a Fool Bull," both allegedly made by Jade to Ed when Ed confronted Jade about his conduct towards J.P. The State also gave notice it intended to elicit testimony that Jade had said "Fuck him up. Fuck him up," to Orlando while Orlando was assaulting Billy. The State also intended to elicit Joyce's statement "The police are coming," and "You don't want to catch a murder rap," made to all of the assailants after Amanda was able to dial her cell phone.

[¶14.] Trial on the matter was originally scheduled for Monday, September 24, 2007. The morning of trial, the deputy state's attorney informed the trial court that he had discovered at 10:00 p.m. the night before that three or four videotapes made by officers at the scene were not identified in police reports, and had not been provided to the defense. Orlando's motion to dismiss for prosecutorial misconduct was denied. The trial court directed the prosecution to turn over the tapes, and for Orlando's counsel to review them prior to the start of trial on Wednesday, September 26, 2007. Jury selection was held on Monday, September 24, 2007. The jury was sworn, and told to return on Wednesday, September 26, 2007.

[¶15.] A hearing on the undisclosed videotapes was held on Tuesday, September 25, 2007, at which time Orlando again moved to dismiss for

prosecutorial misconduct. Defense counsel could not state with certainty whether the tapes contained exculpatory evidence. Due to the less than twenty-four hours counsel had to review the tapes, the best assessment was that the evidence was potentially exculpatory. The trial court denied the motion to dismiss, but granted Orlando's motion for mistrial after it expressed its frustration with the prosecution over its untimely discovery of the videotapes.

[¶16.] The trial was rescheduled for November 11, 2007. At the commencement of trial, the state's attorney provided the defense with a report not previously disclosed. The report concerned L.B.B. and contained the results of her PBT, which was zero.

[¶17.] Orlando again moved for mistrial based on prosecutorial misconduct. The defense conceded it knew that a PBT test had been administered to L.B.B. The prosecution disclosed that the test results had been included in L.B.B.'s CHINS case report but was not included in the criminal investigation file. The report was discovered by the prosecution after Willard's defense counsel inquired further and L.B.B.'s CHINS file was accessed to see if the results were contained in that file. However, counsel for all three defendants had been fully aware for months that L.B.B. had been given a PBT, that she had been taken to the juvenile detention center, and that CHINS proceedings had taken place.

[¶18.] The trial court reviewed the matter. The State argued that the failure to disclose was inadvertent, and that the evidence was not exculpatory in nature. The State also argued that Defendants had been aware that the PBT had been administered prior to the date of the first trial. Orlando's counsel conceded that the

evidence "did not fundamentally change the nature of the defense," and "would be more towards cross-examination and another inconsistency in the State's case." The trial court found, after balancing the interests involved, that dismissal was not warranted. The trial court "excluded[d] the State from using that information on direct examination."

[¶19.]    During voir dire, Orlando's counsel was precluded from addressing the issue of a hung jury. Orlando's counsel made an offer, on the record and outside the presence of the jury, of the proposed hung jury question:

> The question is that law does not – the statement is the law does not require that you have to arrive at a verdict. The law requires that you made a good faith effort to do so. If, after a prolonged deliberation, one or more of you still have an abiding belief that the verdict should go one way and one or more of you have the same exact strongly held belief it should go the other, you all do your duty by deciding not to decide. We call that type of situation a hung jury and there is no disgrace in that. Our law makes the provision for cases where there must be a good faith inability to all agree on a verdict and that a jury trial is not a group where majority rules and the question is – is everyone comfortable with that.

[¶20.]    At the close of the State's case, Orlando made a motion for judgment of acquittal. The motion was denied by the trial court. The matter was submitted to the jury.

[¶21.]    Orlando was found guilty on three counts of Burglary in the First Degree – Inflict Injury on Another (SDCL 22-32-1(1) and one count of Burglary in the First Degree – Committed in Night Time (SDCL 22-32-1(3). Orlando pleaded guilty to a Part II Habitual Criminal Information (SDCL 22-7-7) based on two prior felony convictions from 2004. He was sentenced to forty years for each offense with twenty years suspended on each count subject to Orlando not committing any felony

offenses for thirty years from February 1, 2008. The sentences were imposed concurrently.

[¶22.]    Orlando raises ten issues on appeal:

1.    Whether the trial court erred in denying Orlando's motion to sever and allowing statements into evidence allegedly made by codefendants who did not testify.

2.    Whether the trial court erred in denying Orlando's request for mistrial based on prosecutorial misconduct for failure to promptly provide discovery at the first trial, held on September 24, 2007, and at the second trial, held on November 11, 2007.

3.    Did the trial court err in refusing to allow Orlando's counsel to voir dire potential jurors on the possibility of a hung verdict and in denying a proposed jury instruction regarding the possibility of a hung verdict.

4.    Did the trial court err in refusing to declare a hung jury after the jury indicated to the trial court that it was unable to reach a verdict as to Orlando and Willard Makes Room For Them after deliberating for over nine hours.

5.    Whether the trial court erred in granting the State's motion to have Orlando shackled during trial proceedings.

6.    Did the trial court err in refusing to allow Orlando to elicit testimony regarding Ed Cottier's convictions for domestic violence and his failure to comply with court-ordered treatment for violence.

7.    Did the trial court err in refusing to allow Orlando's counsel to cross-examine witness and alleged victim Billy Cottier regarding sworn statements he made regarding his temper in a different court proceeding that contradicted testimony in the present trial.

8.    Was there sufficient evidence presented at trial from which the jury could have properly convicted Orlando of the charges alleged.

9.    Did the trial court err in failing to sustain Orlando's objections to the State's arguments during the sentencing phase regarding Orlando's family and his alleged gang affiliations.

10. Was the trial court's sentence cruel and unusual punishment under the facts of the case and the record of this action.

## ANALYSIS AND DECISION

[¶23.] **1. Whether the trial court erred in denying Orlando's motion to sever and allowing statements into evidence allegedly made by codefendants who did not testify.**

[¶24.] This Court reviews a trial court's decision to deny a motion to sever the trial of defendants jointly indicted for an offense under the abuse of discretion standard. State v. Jenner, 434 NW2d 76, 80 (SD 1988) (citing State v. Andrews, 393 NW2d 76, 78 (SD 1986); State v. Maves, 358 NW2d 805, 809 (SD 1984)). The defendant must show *substantial* prejudice from the joint trial, which constituted a denial of a fair trial. *Id.* (citing United States v. Carpentier, 689 F2d 21, 27 (2dCir 1982), *cert. denied,* 459 US 1108, 103 SCt 735, 74 LEd2d 957 (1983); State v. Weddell, 410 NW2d 553, 555 (SD 1987); State v. Honomichl, 410 NW2d 544, 546 (SD 1987); *Andrews,* 393 NW2d at 79; *Maves,* 358 NW2d 805 at 809).

[¶25.] The Sixth Amendment right to confront witnesses may be implicated when third-parties testify as to statements made by co-conspirators who do not testify in a joint trial. State v. Zakaria, 2007 SD 27, ¶¶8-9, 730 NW2d 140, 143 (citing State v. Carothers, 2005 SD 16, ¶7, 692 NW2d 544, 546). This Court reviews alleged violations of a constitutional right under the de novo standard of review. *Id.* "A trial court's suppression decision will not be overturned unless this Court finds that 'the trial court has exercised its discretion to an end or purpose not justified by, and clearly against reason and evidence.'" State v. Larson, 512 NW2d 732, 740 (SD

1994) (citing State v. Smith, 477 NW2d 27, 31 (SD 1991); State v. Zachodni, 466 NW2d 624 (SD 1991)).[1]

[¶26.]    Orlando argues on appeal that the trial of the three Defendants should have been severed. He argues that the failure to sever his trial prejudiced him as he was precluded from confronting witnesses against him. Orlando alleges he was unable to cross-examine codefendants as to the testimony of Ed, Billy, Amanda, and Shawna concerning statements allegedly made by Jade and Joyce during the invasion. Jade did not testify at the joint trial; Joyce's trial was severed and she testified at Orlando's trial. Orlando cites to *Bruton v. United States*, 391 US 123, 88 SCt 1620, 20 LEd2d 479 (1968), as support for his proposition that he was unable to exercise his right to confront and cross-examine his codefendants' statements. He also alleges that his Fifth Amendment right not to testify was compromised as the only way he could refute the alleged statements in the event his codefendants refused to testify was to testify himself that such statements were not made.

---

1.    Although we stated in *State v. Tiegen*, 2008 SD 6, ¶27, 744 NW2d 578, 588, that "[a trial] court's decision to admit a co-conspirator's out-of-court statements under SDCL 19-16-3(5) is reviewed under the clearly erroneous standard of review[,]" in that case we reviewed the three specific conditions that must be met in order to admit a co-conspirator's statements. Those three conditions are findings of fact made by a trial court, and are thus, reviewed under the clearly erroneous standard of review. *Id.* (citing United States v. Beckman, 222 F3d 512, 523 (8thCir 2000)). When a defendant challenges the trial court's decision to admit the evidence without challenging its specific findings of fact, as was done in the instant case, our review is conducted under the abuse of discretion standard of review. *Larson*, 512 NW2d at 740.

However, Orlando did not testify at his trial. In addition, Orlando does not contest that the statements were made by a co-conspirator. Instead, Orlando argues that the statements were inculpatory in nature.

[¶27.]    The State argues that the trial court was correct when it determined that the statements allegedly made by co-conspirators Jade and Joyce were admissible under an exception to the hearsay rule in SDCL 19-16-3(5).[2] The State further argues that the statements of the codefendants as testified to by Ed, Billy, Amanda, and Shawna were non-testimonial in nature, and thus, not a violation of Orlando's Sixth Amendment right to cross-examine his codefendants' statements. The statements did not "expressly implicate" Orlando, and made no direct reference to him. Thus, the State argues, the issue falls within the rule of *Richardson v. Marsh*, 481 US 200, 107 SCt 1702, 95 LEd2d 176 (1987), rather than *Bruton*, 391 US 123, 88 SCt 1620, 20 LEd2d 476.

[¶28.]    In *Bruton*, the United States Supreme Court held that "an inculpatory statement as to the defendant, made by a codefendant and related through a third party witness at trial, violates the defendant's Sixth Amendment right to confront his accuser." Iron Shell v. Leapley, 503 NW2d 868, 870 (SD 1993) (citing *Bruton*, 391 US 123, 88 SCt 1620, 20 LEd2d 476). However, if the statements are not inculpatory in nature, they are admissible per the Court's ruling in *Richardson*, 481 US at 208, 107 SCt at 1707, 95 LEd2d 176. *Zakaria*, 2007 SD 27, ¶9, 730 NW2d at

---

2.    SDCL 19-16-3(5) (FRE 801(d)(2)) provides : "A statement is not hearsay if it is offered against a party and is: . . . (5) A statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

143. A statement that does not expressly implicate a codefendant as an accomplice is within the *Richardson* rule rather than the *Bruton* rule. *Id.* A statement that is not incriminating on its face, but becomes so only when linked with other evidence introduced at trial also falls within the *Richardson* rule rather than the *Bruton* rule. *Id.* (quoting *Richardson*, 481 US at 208, 107 SCt at 1707, 95 LEd2d 176).

[¶29.]       The statements in question were made by Jade.[3] These statements included the ones to Ed and Billy Cottier after Jade kissed and made other advances towards J.P., and made in response to Ed and Billy's warning to go and be with L.B.B. in the bedroom or leave. Jade responded: "My homies are a block away" and "I'm a Fool Bull." Jade's next statement was allegedly made while all the intruders were in Ed's apartment and while Orlando was assaulting Billy: "Fuck him up. Fuck him up." Jade's third statement was made to L.B.B. and was to the effect that "I wasn't here and you didn't see me here." The statements purportedly made by Jade must be examined to determine whether they were inculpatory in nature, or instead were properly admitted as statements of a co-conspirator.

[¶30.]       None of Jade's statement named Orlando. Moreover, the statements were not even made about Orlando. Hence, they cannot be considered inculpatory in nature as against Orlando. The statements when considered in light of other testimony offered at trial were incriminatory in that at issue was whether all four of the alleged co-conspirators entered Ed's apartment at the time in question.

---

3.    The statements allegedly made by Joyce are not at issue in that she testified as a witness at Orlando's trial and was subject to cross-examination.

However, on that question, each defendant's statement was internally consistent in that Jade, Joyce, Orlando, and Willard all denied being together and denied invading the apartment. In *Zakaria* we held similar statements to fall within the scope of *Richardson* not *Bruton*. 2007 SD 27, ¶12, 730 NW2d at 144.

[¶31.] Not only were the statements allegedly made by Jade not confessions, they did not directly implicate Orlando and were also not "powerfully incriminating" of their own accord. *See Richardson*, 481 US at 208, 107 SCt at 1707, 95 LEd2d 176. Much like the statements in *Zakaria*, Jade's statements did not contradict Orlando's theory of defense in that nothing in Jade's statements named Orlando as having been present at the time of the invasion. It is the context in which Ed, Billy, Amanda, and Shawna testified that Jade made those statements that contradicts Orlando's theory of defense.

[¶32.] As such, the statements were not inculpatory and were admissible under the rule in *Richardson*. The trial court did not err when denied Orlando's motion to sever, as the admission of Jade's statements did not violate Orlando's right of confrontation.

[¶33.] **2. Whether the trial court erred in denying Orlando's request for mistrial based on prosecutorial misconduct for failure to promptly provide discovery at the first trial, held on September 24, 2007, and at the second trial, held on November 11, 2007.**

[¶34.] "Trial courts have considerable discretion in granting or denying mistrials and determining the prejudicial effect of witness statements." State v. Fool Bull, 2008 SD 11, ¶10, 745 NW2d 380, 385 (citing State v. Buchhold, 2007 SD 15, ¶50, 727 NW2d 816, 828 (citing State v. Anderson, 1996 SD 46, ¶21, 546 NW2d

395, 401) (citations omitted). "Prejudicial error must be shown for a trial court to grant a motion for mistrial." *Id*. (quoting *Anderson*, 1996 SD 46, ¶21, 546 NW2d at 401 (additional citations omitted). However, only prejudicial error will support reversal. *Id*. "Error is prejudicial when, in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it." *Id*. (quoting State v. Mattson, 2005 SD 71, ¶13, 698 NW2d 538, 544).

[¶35.] The record on review shows that the videotaped police interviews did not contain any exculpatory evidence. One of the trial court's possible remedies for the failure to disclose the tapes was to declare a mistrial. The trial court did so in the first trial.

[¶36.] With regard to the second failure to disclose evidence, the record also reveals that defense counsel knew well in advance of all the facts regarding L.B.B. being taken into custody as a CHINS and that a PBT test was conducted. Defense counsel also knew in advance of trial that the results of the PBT test were not in the criminal investigation file. When finally revealed the morning of the first day of the second trial, the PBT report indicated a result of zero. Orlando conceded before the trial court that the PBT report was not exculpatory in nature. He also conceded that it did not change the defense strategy. Instead, Orlando argued that the failure to disclose the report was further evidence of the inconsistencies in the State's case.

[¶37.] On appeal, Orlando argues that the two failures to disclose evidence showed a lackadaisical approach by the State to its obligation to provide prompt discovery. Orlando invites this Court to reverse the trial court's evidentiary rulings

and denial of his motion for mistrial based on the argument that "declaring mistrials and prohibiting the State from using evidence become empty threats and serve no purpose." Orlando cites to *Brady v. Maryland*, 373 US 83, 83 SCt 1194, 10 LEd2d 215 (1963), and its three-step test for determining whether a *Brady* violation has occurred but does not apply the test to the facts of this case.

[¶38.]     In this case, the *Brady* test is inapplicable. "We have noted on numerous occasions that the Brady rule only applies to situations where the defendant discovers *after* trial that the prosecutor had material evidence that was not disclosed during the trial." State v. Fender, 2001 SD 27, ¶11, 623 NW2d 49, 52 (citing State v. Knecht, 1997 SD 53, ¶18, 563 NW2d 413, 420 (citing State v. Fox, 313 NW2d 38, 40 (SD 1981); State v. Moves Camp, 286 NW2d 333, 339 (SD 1979); State v. Sahlie, 277 NW2d 591, 596 (SD 1979))) (emphasis in original ). The rule of *Brady* is inapplicable because the State disclosed all of the contested evidence prior to trial.

[¶39.]     We decline Orlando's invitation to reverse based on what he perceived to be the State's lackadaisical approach to the disclosure of non-exculpatory evidence.[4]

[¶40.]     **3.     Did the trial court err in refusing to allow Orlando's counsel to voir dire potential jurors on the possibility of a hung verdict and in denying a proposed jury instruction regarding the possibility of a hung verdict.**

---

4.     We note that Orlando did not present his argument based on SDCL 23A-13-15 and -17, which provide the trial court discretion in dealing with the untimely disclosure of evidence. No abuse of this discretion has been suggested or shown.

[¶41.]     This Court also reviews a claimed error in the trial court's voir dire procedure under the abuse of discretion standard. *State v. Tapio,* 459 NW2d 406, 412 (SD 1990) (citations omitted). The trial court has wide discretion in the latitude of permissible voir dire question. *State v. Muetze,* 368 NW2d 575, 584 (SD 1985) (citing *Wilson v. Ceretti,* 210 NW2d 643 (Iowa 1973); *People v. Harrell,* 398 Mich 384, 247 NW2d 829 (1976); *Hammill v. State,* 89 Wis2d 404, 278 NW2d 821 (1979)). In voir dire, an abuse of discretion occurs when the defendant is not permitted "some basis for reasonably knowledgeable exercise of the right to challenge." *Tapio,* 459 NW2d at 412 (quoting *State v. Banks,* 387 NW2d 19, 22 (SD 1986) (additional citations omitted)). The right to voir dire is satisfied "when the questions afford defense counsel the information necessary to challenge prospective jurors." *Muetze,* 368 NW2d at 584 (citing *People v. Prast,* 114 MichApp 469, 319 NW2d 627 (1982)).

[¶42.]     Orlando's counsel was precluded from questioning jury panel members about their understanding of a hung jury. The question Orlando's counsel proposed using stated that "the law does not require that you have to arrive at a verdict." The trial court denied Orlando's counsel the use of the question, and a record was made on the matter. Orlando's counsel also offered the substance of the jury question as a jury instruction, which also was denied by the trial court.

[¶43.]     The pattern jury instruction on the issue of the possibility of a hung verdict, which was provided to the jury, was as follows:

> Instruction 45
> . . .
>
> If any member of the jury has any reasonable doubt that the
> defendant committed an offense charged or any reasonable
> doubt upon a single element necessary to constitute an offense

charged as defined for you, then it is that juror's duty to give the defendant the benefit of the doubt and vote for a verdict of not guilty.

The trial court further instructed the jury as follows:

Instruction 35A

. . .

In case of a reasonable doubt as to whether a defendant's guilt is satisfactorily proved by the evidence, your verdict must be not guilty.

Instruction 48

In order to reach a verdict, all jurors must agree.
The jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement if it could be done without violence to individual judgment.

. . .

[N]o juror should surrender an honest belief as to the weight or effect of the evidence solely because of the opinions of the other jurors or for the mere purpose of reaching a verdict.

*Voir Dire*

[¶44.]     In voir dire, the purpose "is to enable counsel to determine whether any prospective jurors ' . . . are possessed of beliefs which would cause them to be biased in such a manner as to prevent his client from obtaining a fair and impartial trial.'" State v. Daniel, 2000 SD 18, ¶11, 606 NW2d 532, 534 (quoting People v. Mackey, 185 Colo 24, 521 P2d 910, 913 (1974)). "Absent agreement between the court and counsel, voir dire of the jury is not the time for . . . attempts at pre-instruction by attorneys[.]" *Id.* (citing Rousseau v. West Coast House Movers, 256 CalApp2d 878, 64 Cal Rptr 655, 660 (1967)).

[¶45.]     Orlando has provided no authority for his proposition that the inability to query the jury panel on their understanding of a hung jury would serve to identify prospective jurors with a bias against him.  The trial court properly denied Orlando's attempt to pre-instruct the jury on a hung jury.

*Jury Instructions*

[¶46.]     Orlando raises this issue on appeal but cites no authority in support of the issue and offers no argument in his brief concerning jury instructions.  "The failure to cite supporting authority is a violation of SDCL 15-26A-60(6) and the issue is thereby deemed waived."  State v. Pellegrino, 1998 SD 39, ¶22, 577 NW2d 590, 599 (quoting State v. Knoche, 515 NW2d 834, 840 (SD 1994); State v. Dixon, 419 NW2d 699, 701 (SD 1988)).

[¶47.]     **4.     Did the trial court err in refusing to declare a hung jury after the jury indicated to the trial court that it was unable to reach a verdict as to Orlando and Willard Makes Room For Them after deliberating for over nine hours.**

[¶48.]     Orlando's final issue is whether the trial court erred when it failed to declare a hung jury after the jury indicated it was unable to reach a verdict as to Orlando and Willard after five hours of deliberations.  Orlando concedes an *Allen* charge was not given.  He argues instead that the trial court coerced the jury into arriving at a verdict by giving it additional time to deliberate the day after it received the case.

[¶49.]     "[T]he length of time a jury is to deliberate is within the wide latitude of discretion vested in the trial court.  Error is only committed when the verdict is coerced by the trial court."  State v. McNamara, 325 NW2d 288, 291 (SD 1982)

-17-

#24812

(citing Karell v. West, 616 SW2d 692 (TexCivApp 1981) *aff'd*, 628 SW2d 48 (Tex 1982)).

[¶50.]    The trial court received a note from the jury after several hours of deliberations in which it stated they were unable to arrive at a unanimous decision with regard to Orlando and Willard but had come to a unanimous decision with regard to Jade. The trial court, with the approval of counsel for Orlando and the State, sent back an instruction asking the jury "Are you ready to go home for the day and come back at 9:30 a.m. in the morning?" The jury responded with a note that said "We feel that more time would not make a difference. We have gone over all the evidence several times and are still hung on Orlando Fool Bull and Willard Makes Room for Them." Based on the jury's note, Orlando moved for mistrial.

[¶51.]    The trial court refused to grant Orlando's motion for mistrial. Instead, it informed counsel "My intention is bring the jury back into the courtroom and admonish them and send them home for the night and bring them back tomorrow." The jury was brought in and told "It's late at night. It's about 11:30 p.m. I'm going to send you home for the night and have you reconvene in the morning," and "I appreciate you being here so late and I know you are all tired. It's too late to make a decision tonight. We'll see you tomorrow." The jury returned the following day and after six hours of further deliberations returned a guilty verdict for Orlando and Willard.

[¶52.]    Orlando argues on appeal that the trial court's comments amounted to a defacto *Allen* charge. Orlando argues that by failing to respond to the jury's first note that it had deliberated for hours and was able to come to a verdict with regard

-18-

to Jade but not Orlando or Willard, and then sending the jury home to return for further deliberations the next day impermissibly coerced the jury into arriving at a verdict. The State argues that it was within the trial court's discretion to allow the jury to continue deliberations on day one, and to bring the jury back for additional deliberations the following day. The State further argues that the fact that the jury deliberated for six hours on day two is a strong indication that the jury was not coerced but arrived at its verdicts through free judgment.

[¶53.] An "*Allen* charge" or "get-together instruction" is not to be used in South Dakota state court criminal trials. State v. Hall, 272 NW2d 308, 312 (SD 1978). "An *Allen* charge is a supplemental jury instruction that advises deadlocked jurors to reconsider and attempt to reach a verdict." United States v. Aldridge, 413 F3d 829, 832 (8th 2005) (citing Allen v. United States, 164 US 492, 501, 17 SCt 154, 41 LEd528 (1896); United States v. Walrath, 324 F3d 966, 970 (8thCir 2003)).

[¶54.] In *Hall*, a criminal case was submitted to the jury at 6 p.m. 272 NW2d at 311. At 10:30 p.m., the trial court sent a message to the jury "Please advise whether you believe that you will be able to arrive at a verdict in this case, or whether you believe that you are hopelessly deadlocked. Do not reveal how you stand numerically or otherwise in responding to this communication." *Id*. at 312. The jury replied that it had taken two votes but did not feel they were hopelessly deadlocked. *Id*. The trial court sent the same message to the jury just before midnight. *Id*. The jury replied that it was making progress and had taken four votes. *Id*. The trial court advised counsel it would declare a mistrial if the jury did not return a verdict by 1 a.m. *Id*. The jury returned a guilty verdict at 12:51 a.m.

*Id.* On appeal, the defendant alleged the judge's inquiries were an innuendo that the verdict should be reached as soon as possible but acknowledged no *Allen* charge was given. *Id.* This Court noted that even when a specific time is given to the jury by which to arrive at a verdict, the effect is not coercive. *Id.* at 313 (citing State v. Klein, 200 NW2d 288 (ND 1972); People v. Luther, 53 MichApp 648, 219 NW2d 812 (1974); State v. Mims, 306 Minn 159, 235 NW2d 381 (1975); Kersey v. State, 525 SW2d 139 (1975)).

[¶55.]    In the case at bar, the trial court did not know how many votes had been taken by the jury or inquire as to the results of any of the jury's votes. Nor did the trial court's comments to the jury instruct deadlocked members of the jury to reconsider and attempt to reach a verdict. Instead, the trial court acknowledged the lateness of the hour and its effect on the jurors' abilities to arrive at a decision. It then provided the jury with a time to return to continue deliberations. The additional six hours of deliberation on day two was a strong indicator that the trial court's instruction to return the next day did not have a coercive effect on the jury but rather served to provide the jury with time to discuss the case.

[¶56.]    In this case, the jury was not given a time by which to arrive at a verdict but instead was given a time by which to return for additional deliberations without any information as to how long the jury would continue its deliberations the following day. The trial court's comments and instructions were made in acknowledgement of the late hour and the long day the jury had already experienced. There is nothing in the record to suggest the trial court told the jury it needed to arrive at a verdict. Instead, it "provided specific, neutral instructions,"

that did not amount to an Allen charge. *See* United States v. Arpan, 887 F2d 873, 877 (8thCir 1989) (quoting United States v. Skarda, 845 F2d 1508, 1512 (8thCir 1988)).

[¶57.]    We have examined the balance of the issues raised by Fool Bull and conclude they are without merit.

[¶58.]    Affirmed.

[¶59.]    KONENKAMP, ZINTER, and MEIERHENRY, Justices, and SABERS, Retired Justice, concur.